**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Grant Creno,                              )        No. CV-12-1642-PHX-SMM
                                          )
             Plaintiff,                   )
                                          )
v.                                        )        **MEMORANDUM OF DECISION AND**
                                          )        **ORDER**
Metropolitan Life Insurance Company,      )
                                          )
             Defendant.                   )
                                          )
_____ )

Before the Court is Plaintiff Grant Creno's and Defendant Metropolitan Life Insurance Company's ("MetLife") cross-motions for summary judgment. (Docs. 28; 30.) The motions are fully briefed (Docs. 38; 42; 46.) For the reasons that follow, Plaintiff's motion is denied and Defendant's motion is granted.

**BACKGROUND**

The facts of this case are virtually undisputed.[1] Plaintiff's brother, Glen Creno ("Glen"), participated in a Life Insurance and Accidental Death and Personal Loss Coverage Plan (the "Plan") issued by MetLife to Glen's employer. (Doc. 53 ¶ 1.) The Plan is subject to the Employee Retirement Income Security Act of 1974 ("ERISA") (Docs. 54 ¶ 4; 43) and

---

[1] The facts that Defendant submitted with its summary judgment motion are not subject to any dispute. (Docs. 53; 44.) The only disputed fact is whether the decedent was "floating" or not; however, ordinary Rule 56 standards do not apply because summary judgment is the vehicle to present the Court with the legal issue of whether the Plan administrator abused its discretion. Stephan v. Unum Life Ins. Co. of Am., 697 F.3d 917, 930 (9th Cir. 2012). Even if ordinary standards did apply, the disputed fact is immaterial.

vests with MetLife, the claims administrator or "fiduciary,"[2] "discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan" (Doc. 53 ¶ 6). Glen named Plaintiff Grant Creno as the sole beneficiary of the Plan's death benefits. (Id.)

Glen was found dead face down in a pond in his yard just before midnight on February 19, 2011. (Docs. 54 ¶¶ 6-7; 53 ¶ 18.) On or about July 20, 2011, MetLife received Plaintiff's claim for benefits, along with a certified copy of Glen's death certificate. (Doc. 53 ¶¶ 8-9.) The death certificate states that the "immediate cause of death" was "drowning" and lists "seizure disorder" as an "other significant condition[] contributing to but not resulting in the underlying cause" of death. (Doc. 53-2 at 6 (capitalization omitted).)

On July 25, 2011, MetLife requested copies of the autopsy report, toxicology report, and police reports, which Plaintiff submitted on August 1, 2011. (Doc. 53 ¶¶ 11-13.) Glen's death was investigated by Phoenix Police Department Officers Todd Ruggeri, Kale Roberts, Ryan Moody, and Tyler Kipper. (Id. ¶¶ 18, 23.) As part of the investigation, Officers Ruggeri and Roberts interviewed Cathryn Creno ("Cathryn"), who was Glen's live-in estranged wife. (Id. ¶ 19.) Cathryn reported that she was in California for the day and that the house was dark when she got home; she discovered Glen's body when she turned on the back yard light. (Id. ¶¶ 20, 23, 24.)

Cathryn explained that Glen had a medical condition which caused seizures.[3] (Id. ¶¶ 23-24.) Although it had been years since Glen experienced a seizure, Cathryn thought a recent illness may have triggered the seizure. (Id. ¶ 26.) She also explained that when Glen had seizures, he would roam around the house in a daze destroying parts of the residence. (Id. ¶ 25.) Cathryn reported that when she saw a broken mirror she thought Glen may have had

---

[2] MetLife is a "fiduciary" because it exercises "discretionary authority . . . in the administration" of the Plan. 29 U.S.C. § 1002(21)(A).

[3] The police report redacts Glen's medical condition, but it is undisputed that the unnamed medical condition is a seizure disorder.

a seizure and suspected a seizure was related to his death. (Id. ¶ 20, 24.)

The condition of Glen's and Cathryn's home was chaotic. Officer Roberts observed "droplets of blood from the front entry area to . . . the access area where the pond is located." (Id. ¶ 26.) Officer Moody noted a broken lamp in the master bedroom, blood on the wall next to the broken lamp, and blood in the walk-in closet. (Id. ¶ 27.) Officer Moody also noted that a toilet seat had been ripped from the toilet, and that the seat's top portion was in the living room. (Id. ¶ 28.) Officer Kipper found a dresser drawer had been pulled out and was laying upside down, that the handle of a door to the back yard had been broken off and placed in a bath tub, and that there were several drops of blood in the tub. (Id. ¶ 29.) Officer Kipper further found that a dining room chair and a section of a couch were on their sides in the living room and that a eyeglasses lens was in the middle of the floor in the dining room. (Id.) Officer Ruggeri reported the cause of death as undetermined and explained the condition of the home supported two theories: that an unknown person or persons may have contributed to Glen's death; or that Glen's death was related to a seizure. (Id. ¶ 22.)

The autopsy report authored by the medical examiner noted Glen had "multiple blunt force injuries" including a laceration on his forehead and a contusion below the left eyebrow, a fractured lower cervical vertebral column, abrasions on his back, and various contusions on his extremities. (Id. ¶ 16.) The autopsy report also noted that Glen was reported to have "a history of postictal[4] agitation and aggressive behavior that would explain the numerous blunt force injuries and disarray inside" his home. (Id. ¶ 17.) Given "the known circumstances surrounding death, the available medical history, and the findings on postmortem examination," the autopsy report concluded that Glen "died from drowning in a back yard water feature, with a contributory factor of seizure disorder." (Id.)

MetLife reviewed the investigative, autopsy, and toxicology reports and sent Plaintiff a letter on August 22, 2011, stating that MetLife would pay the life insurance benefits, but

---

[4] "Postictal" refers to the altered state of consciousness that follows a seizure. Taber's Cyclopedic Medical Dictionary 723, 1718 (19th ed. 2001).

1   not the Accidental Death and Disability ("AD&D") benefits. (Id. ¶¶ 30-31.) Citing the death
2   certificate, Cathryn's statements to the police officers, the investigative report, and the
3   autopsy report, MetLife denied Plaintiff's claim for AD&D benefits because Glen suffered
4   a seizure that significantly contributed to his death. (Id. ¶¶ 32-34.) The letter also gave
5   Plaintiff notice of his right to appeal the denial within 60 days by submitting argument and/or
6   evidence that denial was improper. (Id. ¶ 35.)

7          Plaintiff timely appealed the denial in a October 13, 2011, letter that did not include
8   any additional information and simply argued that MetLife has committed "bad faith" and
9   vowed action "in a court of law." (Id. ¶ 36.) MetLife reviewed and considered all the
10  information submitted with the claim and issued a letter upholding its initial determination.
11  (Id. ¶ 37.) The letter reaffirmed that, based on the record, Glen's death was contributed to by
12  seizure disorder. (Id. ¶ 38.) The letter also apprised Plaintiff of his right to free copies of
13  MetLife's records and to bring a civil action. (Id. ¶ 39.)

14         Plaintiff retained an attorney who requested MetLife reconsider its determination. (Id.
15  ¶ 41.) In a January 31, 2012, letter to Plaintiff's counsel, MetLife reiterated that the Plan does
16  not pay AD&D benefits for deaths that are "contributed to" by a "physical or mental illness
17  or infirmity," but that it would voluntarily permit Plaintiff another opportunity to prove that
18  Glen's seizure disorder did not "contribute to" his death. (Id. ¶¶ 43-44, 47-48.) As part of that
19  voluntary review, MetLife received and began processing medical records concerning Glen's
20  seizure disorder. (Id. ¶ 45.) These records confirmed Glen had been ill the weekend before
21  he died and uniformly supported the fact that Glen was prone to seizures and was being
22  treated by a neurologist for an ongoing "seizure disorder." (Id. ¶¶ 49-51.)

23         However, the voluntary review was cut short and MetLife's initial determination was
24  rendered final on July 10, 2012, when Plaintiff filed suit against MetLife. (Id. ¶ 46.) Plaintiff
25  challenged MetLife's denial of AD&D benefits pursuant to ERISA's civil enforcement
26  provision, 29 U.S.C. 1132(a)(1)(B) in Maricopa County Superior Court. (Doc. 1-1 at 3-5.)
27  MetLife timely removed the action to this Court based on federal question jurisdiction under
28  ERISA. (Doc. 1.)

## THE AD&D POLICY

The Plan's AD&D policy states in relevant part:

> If You or a Dependent sustain an accidental injury that is the Direct and Sole Cause of a Covered Loss described in the SCHEDULE OF BENEFITS, Proof of the accidental injury and Covered Loss must be sent to Us. When We receive such Proof We will review the claim and, if We approve it, will pay the insurance in effect on the date of the injury.
>
> **Direct and Sole Cause** means that the Covered Loss occurs within 12 months of the date of the accidental injury and was a direct result of the accidental injury, independent of other causes.
>
> . . .
>
> **EXCLUSIONS (See notice page for residents of Missouri)**
>
> We will not pay benefits under this section for any loss caused or contributed to by:
> 1. physical or mental illness or infirmity, or the diagnosis or treatment of such illness or infirmity;
> 2. infection, other than infection occurring in an external accidental wound;
> 3. suicide or attempted suicide;
> 4. intentionally self inflicted injury;
> 5. service in the armed forces of any country or international authority, except the United States National Guard;
> 6. any accident related to:
>    • travel in an aircraft for the purpose of parachuting or otherwise exiting from such aircraft while it is in flight;
>    • parachuting or otherwise exiting from an aircraft while such aircraft is in flight, except for self-preservation;
>    • travel in an aircraft or device used:
>       • for testing or experimental purposes;
>       • by or for any military authority; or
>       • for travel or designed for travel beyond the earth's atmosphere;
> 7. committing or attempting to commit a felony;
> 8. the voluntary intake or use by any means of:
>    • any drug, medication or sedative, unless it is:
>       • taken or used as prescribed by a Physician; or
>       • an "over the counter" drug, medication or sedative taken as directed;
>    • alcohol in combination with any drug, medication, or sedative; or
>    • poison, gas, or fumes; or
> 9. war, whether declared of undeclared; or act of war, insurrection, rebellion or riot.

(Doc. 53-4 at 76-77.) Both provisions appear on the first page of the AD&D rider with the exception of the ninth excluded, or noncovered risk, which appears on the following page. (Id.) The omitted provision addresses a presumption of death when the body of the insured is missing. (Id. at 76.)

**STANDARD OF REVIEW**

Benefits denials under ERISA regulated plans are reviewed de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); if the plan unambiguously grants such discretionary authority, then the benefits decision is reviewed for abuse of discretion, id. at 111; Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006) (en banc). When " 'the abuse of discretion standard applies in an ERISA benefits denial case, a motion for summary judgment is,' in most respects, 'merely the conduit to bring the legal question before the district court.' " Stephan v. Unum Life Ins. Co. of Am., 697 F.3d 917, 930 (9th Cir. 2012) (quoting Nolan v. Heald College, 551 F.3d 1148, 1154 (9th Cir. 2009)). As a result, "the usual tests of summary judgment . . . do not apply." Id. (quoting Nolan, 551 F.3d at 1154). One "exception to this feature of ERISA cases" concerns the existence, nature, and impact of a conflict of interest. Id.

The Plan in this case unambiguously grants MetLife discretionary authority to interpret the plan and determine eligibility for benefits. (Doc. 53 ¶ 6.) Accordingly, the Court reviews MetLife's decision for an abuse of discretion. See Abatie, 458 F.3d at 963. However, a structural conflict of interest arises because MetLife both "makes the coverage decisions and pays for the benefits." Harlick v. Blue Shield of Cal., 686 F.3d 699, 707 (9th Cir. 2012). Structural conflicts of interest are "less important when the administrator takes 'active steps to reduce potential bias and to promote accuracy,' " id. (quoting Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 117 (2008)), " 'such as employing a 'neutral, independent review process,' or segregating employees who make coverage decisions from those who deal with the company's finances," id. (quoting Abatie, 458 F.3d at 969 n.7).

Since the abuse of discretion standard is tempered with skepticism commensurate with the conflict, Nolan, 551 F.3d at 1153, the Court must attempt to ascertain the appropriate degree of skepticism, see Salomaa v. Honda Long Term Disability Plan, 642 F.3d 666, 675 (9th Cir. 2011). It is undisputed that MetLife has organizationally and geographically

1   separated its claims department from its finance department. (Doc. 53 ¶¶ 52-53.) It is also

2   undisputed that MetLife neither incentivizes nor penalizes claims personnel based on the

3   value or number of claims they deny or terminate. (Id. ¶ 54.) These factors diminish the

4   "weight" of a structural conflict. Glenn, 554 U.S. at 117; Harlick, 686 F.3d at 707.

5       Plaintiff does not allege that MetLife's decision was driven or otherwise influenced

6   by any conflict of interest. The Court notes, however, that an August 11, 2011, entry in the

7   claim file that states in relevant part:

8           As the death was unattended we would not be able to prove that [Glen]
            had a seizure that caused him to fall into the pond and drown. A denial based
9           on the physical or mental illness exclusion would not be defensible as there
            were no witnesses to the death to confirm that [Glen] suffered a seizure prior
10          to falling into the pond and drowning.

11  (Docs. 28 at 5; 54 ¶ 28.) This comment is at odds with MetLife's ultimate benefits decision

12  and therefore raises the skepticism that tempers the Court's deferential review. See Harlick,

13  686 F.3d at 708. Accordingly, the Court reviews MetLife's denial of AD&D benefits for

14  abuse of discretion while harboring some, but not much, skepticism about the reasonableness

15  of MetLife's decision. Salomaa, 642 F.3d at 675; Nolan, 551 F.3d at 1153.

16                                  **ANALYSIS**

17      As an introductory matter, the Plan provides both AD&D insurance, which

18  indemnifies accidental death, and life insurance, which indemnifies death generally. See 10

19  Couch on Insurance § 139:4, at 139-13 (3d ed. 1995 & 2013 Supp.) [hereinafter Couch].

20  Typically, as is the case here, the radius of AD&D coverage is shorter than that of life

21  insurance coverage and the former is wholly subsumed by the latter. Accordingly, recovery

22  under both types of insurance—double indemnity—is possible when death is accidental

23  within the meaning of the Plan. Id.

24      MetLife approved Plaintiff' claim for life insurance but denied his AD&D claim

25  because, based on the record, "death was contributed to by seizure disorder." (Docs. 53-2 at

26  92; 53-3 at 3.) Plaintiff argues this denial was an abuse of discretion in two respects: first,

27  that there was insufficient evidence to determine that Glen suffered a seizure, let alone that

28  the seizure, if any, caused death. Second, Plaintiff argues MetLife's interpretation of the

1  exclusion "for any loss caused or contributed to by . . . illness" was unreasonably expansive

2  inasmuch as it excluded losses that were indirectly caused by illness. The Court addresses

3  the two issues in reverse order because the former—whether there was sufficient evidence

4  to conclude that Glen suffered a seizure that "contributed to" his death—depends on the

5  meaning of the word "contributed."

6  **I.    Interpretive Challenges**

7          The Ninth Circuit "equate[s] the abuse of discretion standard with arbitrary and

8  capricious review," which means MetLife's "interpretation of Plan language is entitled to a

9  high level of deference and will not be disturbed unless it is 'not grounded on any reasonable

10 basis.' " Tapley v. Locals 302 and 612 of the Int'l Union of Operating Engineers-Employers

11 Constructions Indus. Retirement Plan, 728 F.3d 1134, 1139 (9th Cir. 2013) (internal

12 quotation marks omitted) (quoting Oster v. Barco of Cal. Emps.' Ret. Plan, 869 F.2d 1215,

13 1218 (9th Cir. 1988)). More simply, MetLife's "interpretation of the plan 'will not be

14 disturbed if reasonable.' " Conkright v. Frommert, 559 U.S. 506, 521 (2010) (quoting

15 Firestone, 489 U.S. at 111). An interpretation is unreasonable and without rational

16 justification when it "clearly conflicts with the plain language of the plan." Johnson v.

17 Trustees of W. Conf. of Teamsters Pension Trust Fund, 879 F.2d 651, 654 (9th Cir. 1989).

18 Reasonableness is further circumscribed by the primary purpose of the Plan, common-sense

19 understandings, and principles of contract and trust law. US Airways, Inc. v. McCutchen,

20 133 S.Ct. 1537, 1549 (2013); Tapley, 728 F.3d at 1140.

21         Review of interpretive challenges for an abuse of discretion requires courts to "first

22 look to [the] explicit language of the agreement," Richardson v. Pension Plan of Bethlehem

23 Steel Corp., 112 F.3d 982, 985 (9th Cir. 1997) (quoting Armistead v. Vernitron Corp., 944

24 F.2d 1287, 1293 (6th Cir. 1991)), and "closely read[] contested terms," construing them " 'in

25 an ordinary and popular sense as would a person of average intelligence and experience.' "

26 Tapley, 728 F.3d at 1140 (quoting Richardson, 112 F.3d at 985). When the plain words of

27 the Plan leave the meaning of a term uncertain, "it is the administrator," not the Court, "who

28 resolves ambiguities in the plan's language." Day v. AT & T Disability Income Plan, 698

1  F.3d 1091, 1098 (9th Cir. 2012).

2      MetLife's "interpretation need not be the one this court would have reached, but only

3  an interpretation which has rational justifications." Tapley, 728 F.3d at 1139-40 (quoting

4  Smith v. CMTA-IAM Pension Trust, 654 F.2d 650, 655 (9th Cir. 1981)). Thus, MetLife's

5  interpretation is entitled to deference so long as it "fall[s] somewhere on a continuum of

6  reasonableness—even if on the low end." Corry v. Liberty Life Assur. Co. of Boston, 499

7  F.3d 389, 398 (5th Cir. 2007) (quoting Vega v. Nat'l Life Ins. Servs., Inc., 188 F.3d 287, 297

8  (5th Cir. 1999) (en banc), abrogated in part on other grounds by Glenn, 554 U.S. 105);

9  accord Canseco v. Constr. Laborers Pension Trust for S. Cal., 93 F.3d 600, 606 (9th Cir.

10  1996) (quoting Winters v. Costco Wholesale Corp., 49 F.3d 550, 553 (9th Cir. 1995)).

11      **A.    The Flexibility of Firestone Deference**

12      Plaintiff argues MetLife's interpretation is per se unreasonable "because it ignored

13  case law establishing" that an illness does not "cause or contribute" to loss when the illness

14  causes a fatal accident as opposed to death itself. The unstated assumption of Plaintiff's

15  argument is that an ERISA plan administrator necessarily abuses its discretion if it reaches

16  a different interpretation than does a federal court. This assumption is false.

17      The Supreme Court rejected the notion that "a one-size-fits-all procedural system"

18  would be "likely to promote fair and accurate review" given that "[b]enefits decisions arise

19  in too many contexts, concern too many circumstances, and can relate in too many different

20  ways to conflicts—which themselves vary in kind and in degree of seriousness." Glenn, 554

21  U.S. at 116. The Court explained that determination of whether a benefits decision was an

22  abuse of discretion requires the reviewing court to take "account of several different, often

23  case-specific, factors." Id. at 117. ERISA's "interests in efficiency, predictability, and

24  uniformity" undercut the proposition that interpretive discretion gets whittled away each time

25  a federal court interprets a policy term in an ERISA case. See Conkright, 559 U.S. at 518.

26  Such a rule would place administrators in an impossible position as soon as different

27  jurisdictions reached conflicting interpretations. See id. at 520. Moreover, uncertainty about

28  whether a sufficiently similar policy term had been interpreted and had been applied to

1   sufficiently analogous facts is precisely the type of "further complexity" for which "there is

2   little place in the ERISA context." Id. at 519 (quoting Glenn, 554 U.S. at 117). Glenn's

3   recognition "that there 'are no talismanic words that can avoid the process of judgment,' "

4   554 U.S. at 119 (quoting Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 489 (1951)),

5   applies with equal force to both the standard of review and policy terms that are the subject

6   of such review.

7          The Court rejects Plaintiff's argument that an ERISA administrator is stripped of

8   interpretive discretion whenever federal courts interpret similar policy language. Courts

9   reviewing benefits decisions for abuse of discretion cannot avoid the process of evaluating

10  whether an ERISA administrator's interpretation was reasonable, even if other courts have

11  already interpreted similar language. See LaAsmar v. Phelps Dodge Corp. Life, Accidental

12  Death & Dismemberment and Dependent Life Ins. Plan, 605 F.3d 789, 805 n.10 (10th Cir.

13  2010) (explaining that similar policy language may be interpreted differently depending on

14  the facts of the case and the issue at hand). Rather, depending on the circumstances,

15  analogous policy language may be interpreted differently by the same court. Compare

16  Pirkheim v. First Unum Life Insurance, 229 F.3d 1008, 1010-11 (10th Cir. 2000) (construing

17  "directly and independently of all other causes" as excluding all contributory causes), with

18  Kellogg v. Metro. Life Insurance Co., 549 F.3d 818, 832 (10th Cir. 2008) (construing "direct

19  result . . . , independent of other causes" as "exclud[ing] only losses caused by physical

20  illness," as opposed to "losses due to accidents that were caused by physical illness").

21          **B.     Application of Firestone Deference**

22          "The intended meaning of even the most explicit language can, of course, only be

23  understood in the light of the context that gave rise to its inclusion." Richardson, 112 F.3d

24  at 985 (quoting Armistead, 944 F.2d at 1293). Since an exclusion operates to eliminate

25  coverage that would otherwise exist, an exclusion's range of reasonable interpretations is

26  informed by the provision that specifies the requirements for coverage.

27          The Plan provides coverage for an accidental injury that is the direct and sole cause

28  of a covered loss, which means that the loss "was a direct result of the accidental injury,

independent of other causes." The term "direct result" in the main clause is not defined by the Plan but could commonly be understood to "requir[e] the plaintiff to show that the accident was the predominant, as opposed to remote, cause." McClure v. Life Ins. Co. of N. Am., 84 F.3d 1129, 1135 (9th Cir. 1996) (per curiam) (quoting Henry v. Home Ins. Co., 907 F. Supp. 1392, 1394, 1398 (C.D. Cal. 1995)); see Couch §§ 139:30 to :31, at 139-67 to -70. Likewise, the undefined term "accidental injury" could be understood to mean unexpected or unforeseen bodily harm. See Padfield v. AIG Life Ins. Co., 290 F.3d 1121, 1126 (9th Cir. 2002); Couch § 139:13, at 139-32. Thus, the principal condition for AD&D benefits is that the predominant cause of loss was unexpected bodily harm. The secondary condition for coverage is stated by the subordinate clause, "independent of other causes," which requires accidental injury to be the sole direct cause of loss (a "sole cause" clause). Generally, "sole cause" clauses specify in various formulations that loss must arise "solely" from accident and/or "directly and independently of other causes." See J.A. Bock, Annotation, Pre-existing physical condition as affecting liability under accident policy or accident feature of life policies, 84 A.L.R.2d 176, §§ 3, 4[b] (1962 & 2002 Supp.).

MetLife neither proposed an interpretation for, nor based its benefits decision on, the sole cause clause. There are different ways to construe such clauses,[5] but the Court may

---

[5] Compare Criss v. Hartford Acc. & Indem. Co., 963 F.2d 373, 1992 WL 113370, at *5-6 (6th Cir. May 28, 1992) (unpublished table decision) (per curiam) (affirming district court's interpretation of "directly and independently of all other causes" as "cover[ing] only those narrow instances in which there is an absolute nexus between the accident and the loss"), with Dixon v. Life Ins. Co. of N. Am., 389 F.3d 1179, 1184 (11th Cir. 2004) (interpreting "directly and from no other causes" to exclude from coverage preexisting conditions that "substantially contributed" to loss), and McClure, 84 F.3d at 1136 (interpreting "directly and independently" the same way), and Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d 1017, 1032 (4th Cir. 1993) (en banc) (same), with Sekel v. Aetna Life Ins. Co., 704 F.2d 1335, 1342 (5th Cir. 1983) (holding generally that "directly and independently" excludes coverage if a preexisting condition "is a concurrent proximate cause"), with Vickers v. Boston Mut. Life Ins. Co., 135 F.3d 179, 181 (1st Cir. 1998) (construing "directly and from no other causes" as not barring recovery for loss due to accidental injury caused by a preexisting condition, which would require a "directly or indirectly" exclusionary clause).

1   proceed by construing the sole cause clause in this case—"direct result of the accidental

2   injury, independent of other causes"—in a manner that comports with both the Plan's plain

3   language and MetLife's interpretation of the exclusionary clause. One reasonable

4   interpretation of the clause is that it precludes coverage where illness substantially

5   contributes to loss. See McClure, 84 F.3d at 1135-36. McClure reviewed a benefits denial

6   based on a "directly and independently" sole cause clause de novo and held that so long as

7   the clause was conspicuous, "it would bar recovery if a preexisting condition *substantially*

8   *contributed* to the [loss]," and "could result in a denial of recovery even though the claimed

9   injury was the predominant or proximate cause of the [loss]." Id.

10      It is uncontroverted that an illness substantially contributes to death when it directly

11  and immediately causes a fatal accidental injury. E.g., Miller v. The Hartford Life and Acc.

12  Ins. Co., No. 1:08–CV–2014–RWS, 2010 WL 1050006, at *9 (N.D. Ga. Mar. 17, 2010)

13  (applying substantially contributed test and affirming denial of accidental death benefits

14  because "cardiac event due to heart disease was a substantially contributing cause of

15  [drowning] death"); Pedersen v. Union Labor Life Ins. Co., No. 06-C-75, 2006 WL 3474183,

16  at *5-6 (E.D. Wis. Nov. 29, 2006) (affirming denial of accidental death benefits because

17  illness that is but for cause of death substantially contributes thereto). Therefore, the sole

18  cause clause could reasonably be construed to exclude from AD&D coverage death in which

19  illness directly causes the fatal accidental injury. See McClure, 84 F.3d at 1135-36.

20      In addition to the sole cause clause, there is an exclusion for "loss[es] caused or

21  contributed to by" nine noncovered risks (an "exclusionary" clause). Such clauses can

22  reasonably be interpreted to exclude coverage if a noncovered risk, like illness, cooperated

23  "in any degree" with the accidental injury that resulted in loss. 10 Couch § 141:28, at 141-61.

24  Inversely, coverage exists only "if the accidental injury, independently and exclusively of the

25  infirmity, proximately caused death." Id.; see, e.g., 84 A.L.R.2d 176, § 4[a] (citing cases).

26      MetLife contends the exclusionary clause eliminates coverage when a noncovered

27  risk, such as illness, is a factor that helped bring about death. (Docs. 30 at 13; 42 at 14-16.)

28  This interpretation does not conflict with the Plan's plain language: "caused" could be

commonly understood as "to be the [event that is responsible for a result]," while "contributed" could commonly be understood as "to help being about a result; act as a factor." American Heritage Dictionary 296, 400 (4th ed. 2000). In fact, the phrase "caused or contributed to" is substantially congruent with "directly or indirectly" and is capable of signaling the exclusion of losses in which illness is a nonproximate contributory cause. Metlife's interpretation of the exclusionary clause performs a function distinct from the putative interpretation of the sole cause clause: the latter focuses on the substantiality of other causes; the former focuses on the character of other causes. The two clauses thus operate in tandem: the sole cause clause operates where there is more than one substantial cause, regardless of its character; the exclusionary clause operates where there is another cause of certain character, regardless of substantiality. See 10 Couch § 141:7, at 141-17.

Reviewing for abuse of discretion, the Court is not compelled "to torture or twist the language of the policy" when "a reasonable interpretation favors the insurer." Evans v. Safeco Life Ins. Co., 916 F.2d 1437, 1441 (9th Cir. 1990) (quoting Allstate Ins. Co. v. Ellison, 757 F.2d 1042, 1044 (9th Cir. 1985)) (requiring the absence of other unstrained interpretations on de novo review); see Tapley, 728 F.3d at 1139-40. Since MetLife's interpretation does not conflict with the plain language of the Plan or render other provisions nugatory, it is entitled to deference. See Day, 698 F.3d at 1098; cf., e.g., Brown v. PFL Life Ins. Co., 312 F. Supp. 2d 863, 869 (N.D. Miss. 2004) (affirming benefits denial for insured who suffered heart attack that caused fatal auto collision based on exclusion for losses "that 'result[ed], directly or indirectly, . . . or is contributed to, wholly or in part, by . . . disease' ").

Plaintiff does not argue this interpretation was made in bad faith,[6] see Abatie, 458

---

[6] The Court notes that the omission of exclusions from the Summary Plan Description of AD&D benefits (Doc. 53-4 at 101-02) violates ERISA's statutory and regulatory accuracy requirements. 29 U.S.C. § 1022; 29 C.F.R. §§ 2520.102–2, –3. Pursuant to 29 U.S.C. § 1132(a)(3), a beneficiary may be able to obtain " 'appropriate equitable relief' to redress [statutory] violations." CIGNA Corp. v. Amara, 131 S. Ct. 1866, 1878 (2011) (quoting § 1132(a)(3)); see McCutchen, 133 S. Ct. at 1548. However, Plaintiff seeks "to recover benefits due to him under the terms of his plan" under § 1132(a)(1)(B), not an equitable

F.3d at 963, nor does Plaintiff allege this interpretation defeats Glen's objectively reasonable expectation for coverage, see Winters, 49 F.3d at 554-55 (applying reasonable expectations doctrine to abuse of discretion review of benefits decision). Plaintiff offers no alternative interpretation, let alone one that would give effect to both the sole cause and exclusionary clauses. Plaintiff's lone interpretive argument is that MetLife committed legal error and therefore abused its discretion by not following the Tenth Circuit's interpretation of "sole cause" and "exclusionary" clauses. (Docs. 28 at 4-5; 38 at 3.)

In support of his contention that MetLife abused its discretion by "ignoring" case law that reached a different interpretation, Plaintiff cites a handful of federal ERISA decisions that follow or are consistent with the Tenth Circuit's reasoning in Kellogg. E.g., LaAsmar, 605 F.3d 789; Vickers v. Boston Mut. Life Ins. Co., 135 F.3d 179 (1st Cir. 1998); Pavich v. Aetna Life Ins. Co., No. 09–818, 2010 WL 3854733 (D. Colo. Sept. 27, 2010). Plaintiff also cites the Texas Court of Appeals pre-ERISA decision National Life & Accident Insurance Co. v. Franklin, 506 S.W.2d 765 (Tex. Ct. App. 1974).[7] Although not cited by Plaintiff because the case was decided after briefing had completed, Kellogg was also followed by Ferguson v. United of Omaha Life Insurance Co., No. WMN–12–1035, 2014 WL 956886 (D. Md. Mar. 11, 2014). So Plaintiff's argument goes, the foregoing cases render unreasonable any interpretation of the Plan that excludes losses due to accidental injury when

---

remedy under § 1132(a)(3). (See Doc. 1-1 at 5.) Hence, the Court does not consider whether Plaintiff could avail himself of equitable remedies. See Skinner v. Northrop Grumman Ret. Plan B, 673 F.3d 1162, 1167 (9th Cir. 2012).

[7] While the Court applies interpretive principles derived from state law, Richardson, 112 F.3d at 985, the Court is not bound by state law interpretations of similar terms, McClure, 84 F.3d at 1129. Franklin's persuasive authority is further constrained by its posture: the court considered the sufficiency of evidence for a jury verdict for a beneficiary when insured may have suffered a seizure before falling to his death. 506 S.W.2d at 766.

In any event, Franklin construed an AD&D policy with a "directly and independently of all other causes" sole cause clause and an exclusion for loss that "results from or is contributed to by any disease," and recognized recovery could be defeated where illness "materially contribute[d]" to death. Id. at 767-68. Franklin understood the term as precluding recovery where illness was a concurrent proximate cause. Id.

1  such injury is caused by illness. The Court does not find this argument persuasive.

2       First, an ERISA's administrator's interpretive discretion is not, as Plaintiff assumes,

3  bounded by prior judicial interpretations of similar language. See discussion supra Part I.A.

4  Rather, the focus is on whether the terms of the Plan provide "any reasonable basis" for

5  upholding MetLife's interpretation. See Tapley, 728 F.3d at 1139 (quoting Oster, 869 F.2d

6  at 1218). This "[d]eference is particularly weighty where, as here," the interpreted language

7  is reasonably susceptible of more than one meaning. Id. It is neither arbitrary nor capricious

8  to define "contributed" as meaning "act[ed] as a factor" and the Court finds that MetLife's

9  interpretation of the exclusion *vis-à-vis* illness—excluding coverage where illness acted as

10 a factor in death—to be well inside the bounds of reason. See Restatement (Second) of Trusts

11 § 187 cmt. e (1959) (explaining "the court will not interfere unless the trustee," *inter alia*,

12 "acts beyond the bounds of a reasonable judgment").

13      The same result occurs even if interpretive discretion is constrained in the manner

14 advanced by Plaintiff because none of the cases cited by Plaintiff are controlling authority,

15 see Hart v. Massanari, 266 F.3d 1155, 1170-74 (9th Cir. 2001), and there are some material

16 differences between Plaintiff's cases and Ninth Circuit jurisprudence. For example, unlike

17 the sharp distinction drawn between illness that causes or contributes to *death* as opposed to

18 *the accident that causes death*, e.g., Kellogg, 549 F.3d at 832, the Ninth Circuit held that,

19 pursuant to a sole cause clause, AD&D benefits could be denied when illness substantially

20 contributed to loss, "even though the claimed injury was the predominant or proximate

21 cause," McClure, 84 F.3d at 1136. The putative interpretation of the sole cause clause here

22 is consistent with McClure, which contemplated circumstances in which illness may operate

23 as a bar to recovery despite not causing death—even on de novo review.

24      Likewise, the Ninth Circuit has made it clear that the doctrine of *contra proferentem*

25 (construing ambiguous insurance terms against the insurer) does not apply where the ERISA

26 policy grants the administrator interpretive discretion. Day, 698 F.3d at 1098; Blankenship

27 v. Liberty Life Assur. Co. of Boston, 486 F.3d 620, 625 (9th Cir. 2007); Winters, 49 F.3d at

28 554. Kellogg, LaAsmar, and Pavicich all resolved ambiguous terms against the insurer.

LaAsmar, 605 F.3d at 805; Kellogg, 549 F.3d at 830; Pavicich, 2010 WL 3854733, at *7-9. Ferguson, while not applying the doctrine itself, relied on Kellogg and other cases that construed terms against the insurer. The terms here were not construed against MetLife.

What is more, notwithstanding Plaintiff's assertion that his cases are "substantively indistinguishable" from the case at bar (Doc. 28 at 11), none share with the instant case a concurrence of: (1) the same standard of review; (2) the same policy language; (3) analogous facts; and (4) the same justification for denying benefits. Compare, LaAsmar, 605 F.3d at 800-01, and Kellogg, 549 F.3d at 823, 828, 832 & n.6, with Ferguson, 2014 WL 956886, at *2-5, *11, and Pavicich, 2010 WL 3854733, at *2, *4-5, *8. These cases aptly illustrate the diverse array of contexts, circumstances, and conflicts that make "a one-size-fits-all procedural system" unlikely "to promote fair and accurate review." Glenn, 554 U.S. at 116.

Despite different policy language and a different rationale for denying AD&D benefits, Ferguson is the case that most closely matches the standard of review and factual circumstances of the case. The operative policy term in Ferguson established coverage where the insured "is injured a result of an Accident,[8] and that Injury[9] is independent of Sickness[10] and all other causes." 2014 WL 956886, at *2. The insured suffered from a seizure disorder that, although treated by a physician, caused him to twice drown while swimming; he survived the first drowning but the second was fatal. Id. at *1-2, *6. Ferguson cited the Fourth Circuit's two-step "substantially contributed" test for determining whether a sole cause clause eliminates coverage for illness, id. at *5 (quoting Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d 1017, 1028 (4th Cir. 1993) (en banc)), but never actually considered whether the seizure substantially contributed to death. Persuaded by Kellogg, Franklin, and

---

[8] "Accident means a sudden, unexpected, unforeseeable and unintended event, independent of Sickness and all other causes." 2014 WL 956886, at *2.

[9] "Injury means an accidental bodily injury which requires treatment by a Physician. It must result in loss independently of Sickness and other causes." Id.

[10] "Sickness means a disease, disorder or condition, which requires treatment by a Physician." Id.

1  Pavicich, the court reasoned it "need not decide if it was reasonable . . . to conclude that a

2  seizure *was a cause of the drowning*, because . . . the relevant question under the Policy [was]

3  whether . . . seizure disorder *was a cause of his death*." Id. at 6-8. Answering its inquiry in

4  the negative, the court emphasized "that insurance policies should not be so strictly

5  interpreted that they nullify the benefits that the insured reasonably expects from such a

6  policy." 2014 WL 956886, at *12. The Court finds Ferguson inapposite to the present case

7  given the differing facts, policy terms, and controlling law.

8       Conflicting judicial interpretations of a policy term do not necessarily render the

9  term's constituent language ambiguous, Evans, 916 F.2d at 1441 (quoting Ellison, 757 F.2d

10  at 1044), but interpretive dissonance may evince a longer continuum of reasonableness upon

11  which an ERISA administrator's interpretation of the term may land. Given the interpretive

12  interdependence between sole cause and exclusionary clauses, it follows that interpretive

13  dissonance regarding sole cause clauses leaves room for reasonable minds to differ about the

14  interpretation of exclusionary clauses like the one here. MetLife's interpretation of the

15  exclusionary clause is entitled to deference in this case because it accords with the Plan's

16  primary purpose and its plain language without rendering nugatory any other term.

17  **II.   Factual Challenges**

18       "[A] plan administrator's [benefits] decision 'will not be disturbed if reasonable.' "

19  Stephan, 697 F.3d at 929 (quoting Conkright, 559 U.S. at 521). "This reasonableness

20  standard requires deference to the administrator's benefits decision unless it is '(1) illogical,

21  (2) implausible, or (3) without support in inferences that may be drawn from the facts in the

22  record.' " Id. (quoting Salomaa, 642 F.3d at 676). It is not arbitrary or capricious to draw a

23  rational inference from evidence in the record. Boyd v. Bert Bell/Pete Rozelle NFL Players

24  Retirement Plan, 410 F.3d 1173, 1178-79 (9th Cir. 2005) (affirming benefits denial when

25  decision based on substantial evidence); see Blankenship, 486 F.3d at 628 (quoting Blanton

26  v. Anzalone, 813 F.2d 1574, 1575 (9th Cir. 1987)) (in context of prejudgment interest on an

27  ERISA award, " '[s]ubstantial evidence' is defined as 'such relevant evidence as a reasonable

28  mind might accept as adequate to support a conclusion' ").

1    The administrator also abuses its discretion if it relies on a clearly erroneous finding
2    of fact. Boyd, 410 F.3d at 1178. "A finding is 'clearly erroneous' when although there is
3    evidence to support it, the reviewing [body] on the entire evidence is left with the definite
4    and firm conviction that a mistake has been committed" Id. (quoting Concrete Pipe & Prods.
5    of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602, 622 (1993)). Thus,
6    "even decisions directly contrary to evidence in the record do not necessarily amount to an
7    abuse of discretion." Id. (quoting Taft v. Equitable Life Assurance Soc'y, 9 F.3d 1469, 1472
8    (9th Cir. 1993), abrogated on other grounds by Abatie, 458 F.3d at 973).

9    The following facts are established in the record: Cathryn reported to police that Glen
10   suffered from a seizure disorder and that during episodes he would "roam[] around the house
11   in a daze . . . destroying parts of the residence." (Doc. 53 ¶ 25.) Glen's and Cathryn's home
12   was in a state of disorder: there was a broken lamp and mirror; furniture had been overturned;
13   a toilet seat had been torn from the toilet; a doorhandle had been broken off; and there was
14   blood on the walls, floor, and bathtub. (Id. ¶¶ 24, 26-29.) Given the condition of the house
15   and that Glen recently came down with the flu, Cathryn suspected Glen suffered a seizure
16   even though it had been years since his last episode. (Id. ¶ 20, 26.) Officer Ruggeri's
17   assessment of the evidence was that Glen died either as a result of foul play or a seizure. (Id.
18   ¶ 22.) The medical examiner ("M.E.") explained that Glen's "history of postictal agitation
19   and aggressive behavior . . . would explain the numerous blunt force injuries and disarray
20   inside the residence." (Id. ¶ 17.) Based on the circumstances of death, reported medical
21   history, and autopsy, the M.E. concluded the immediate cause of Glen's death was drowning
22   but that seizure disorder was a significant contributory cause. (Id.) In turn, MetLife relied on
23   the police report, the M.E.'s report, and death certificate in concluding that Glen's seizure
24   disorder contributed to his death and was therefore not covered by the AD&D policy
25   pursuant to the exclusionary clause. (Id. ¶¶ 32-34, 43-44, 47-48.)

26   According to MetLife, it relied on a statutorily mandated evaluation of
27   evidence—gathered in the ordinary course of a police investigation—by a disinterested
28   government official with recognized credentials. See Ariz. Rev. Stat. §§ 11-594, 11-597.

Based on that evidence, Met Life did not—and could not—dispute that Glen's death was predominantly caused by accidental injury. MetLife could and did, however, take the position that the evidence suggested Glen would not have drowned to death but for a seizure. Since it is undisputed that a seizure disorder constitutes a "physical or mental illness or infirmity," and is therefore a noncovered risk pursuant to the exclusionary clause, MetLife concluded Plaintiff was not entitled to payment of AD&D benefits because Glen's seizure disorder contributed to his death.

Plaintiff contends that "MetLife's decision to deny benefits to [Plaintiff] is based upon rank speculation." (Doc. 38 at 2.) Plaintiff's argument rests on two premises, both of which flawed. The first premise is that a decision is speculative if it is not based on direct evidence, such as the account of a percipient witness. (Id.) Plaintiff cites no authority in support of his contention that ERISA administrators must base their benefits decisions on only direct evidence, nor is the Court aware of any such authority. To the contrary, juries are routinely instructed that "[t]he law makes no distinction between the weight to be given to either direct or circumstantial evidence." Ninth Circuit Manual of Model Jury Instructions, Civil, § 1.9 (2007 ed.). For this reason, the import of the August 11, 2011, claims entry emphasizing the absence of a percipient witness is diminished. (Docs. 28 at 5; 54 ¶ 28.)[11]

The second premise is that the record is devoid of substantial evidence upon which MetLife's benefits decision could stand. Plaintiff posits Cathryn's statements to the police are insubstantial because "there was no reason to believe [Cathryn] had the foundation to know" about Glen's history of seizures and that "there is no evidence that [Cathryn] had the personal or medical knowledge to reliably" suspect that Glen suffered a seizure that contributed to his death. Alternatively, Plaintiff contends there is no evidence from which anyone could infer that Glen's drowning was causally or temporally related to his seizure.

The Court disagrees with Plaintiff. There is ample evidence from which Cathryn, the

---

[11] Relatedly, initially framing the issue as whether the seizure "caused," as opposed to "contributed to," Glen's drowning death did not strip MetLife of its interpretive discretion. See Conkright, 559 U.S. at 513 (rejecting " 'one-strike-and-you're-out' approach").

M.E., and MetLife could have drawn inferences to support their conclusions. As to Cathryn's knowledge about Glen's seizure disorder, it is both logical and plausible to infer that an individual would, out of their own self-interest, inform a co-habitant of any serious medical conditions, especially when those conditions potentially endanger the co-habitant or may require the co-habitant to take action. Likewise, it is rational and reasonable to infer that the co-habitant would become familiar with observable manifestations of the individual's medical condition. The strength of these inferences is amplified considerably when the co-habitants are legally married and have lived together for some time.

It is not only possible, but is likely that Cathryn would have personal knowledge about Glen's seizure disorder. Indeed, Cathryn's familiarity with Glen's seizure disorder underlies Plaintiff's contention that MetLife improperly weighed Cathryn's statement that it had been years since Glen's last seizure. As it is reasonable to infer Cathryn possessed personal knowledge about Glen's medical conditions, her statements to the police provided a substantial evidentiary basis to conclude Glen suffered from a seizure disorder characterized by postictal aggression. In turn, the chaotic condition of the home and Glen's numerous physical injuries permit the inference that Glen suffered a seizure.[12]

The evidence that Glen *did not* suffer a seizure is limited. There are, in fact, two pieces of evidence in the record capable of supporting the inference: (1) Cathryn's statement that it had been years since Glen's last seizure; and (2) Officer Ruggeri's recognition that the condition of Glen's and Cathryn's home could be explained by foul play or by a seizure. While Plaintiff refuses to concede that Glen had a seizure in the first instance (Doc. 28 at 11), he suggests no alternative explanation for Glen's numerous injuries or the condition of Glen's and Cathryn's home. Plaintiff hypothesizes that even if Glen did suffer a seizure, it "may well have resolved when he accidentally tripped and fell into the pond and drowned hours later." (Doc. 38 at 2.) This hypothesis, puzzling though it may be, merely offers an

---

[12] Thus, Plaintiff's contention that the M.E.'s conclusion was invalid for want of unspecified "medical evidence of Glen's purported history of seizures" fails. (Doc. 38 at 2.)

1   alternative explanation. At most, the evidence could have been resolved either

2   way—resolution of equivocal evidence is neither arbitrary nor capricious, see Boyd, 410

3   F.3d at 1178, especially where, as here, the evidence is not in equipoise.

4        The Court finds MetLife's conclusion was neither arbitrary nor capricious, but was

5   reasonable, logical, and possessed an adequate evidentiary basis. Cathryn's characterization

6   of Glen's seizure disorder, the chaotic condition of the home, the assessments of the police

7   officers, Glen's multiple injuries, the results of the autopsy, and the death certificate provide

8   ample evidence to support the inference that Glen indeed had a seizure that was the

9   immediate cause of his drowning. The Court is not left with a definite and firm conviction

10  that a mistake has been made; therefore, MetLife's decision is entitled to deference.

11                              **CONCLUSION**

12       The plain language of the Plan could reasonably be interpreted to exclude AD&D

13  coverage for death that is nonproximately or contributorily caused by illness, even though

14  the proximate and more immediate cause of death is accidental injury. The facts in the record

15  provide sufficient basis to conclude Glen had a seizure disorder that was the proximate and

16  immediate cause of his drowning. Therefore, MetLife did not abuse its discretion by denying

17  AD&D benefits because Glen's "physical or mental illness" "contributed to" his death.

18       Accordingly,

19       **IT IS HEREBY ORDERED denying** Plaintiff's Motion for Summary Judgment.

20  (Doc. 28) and **granting** MetLife's Motion for Summary Judgment (Doc. 30).

21       **IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment for

22  Defendant and terminate the case.

23       DATED this 14th day of August, 2014.

24

25

26                              Stephen M. McNamee
                                Senior United States District Judge
27

28

- 21 -